[File No. 6489.]

JACOB E. STUTSMAN, Respondent, v. STATE OF NORTH DAKOTA, Doing Business as the Bank of North Dakota, a Corporation, and Virgil Lockhart, Appellants.

(275 N. W. 387.)

Opinion filed October 8, 1937.

*P. H. Butler* and *Robert Birdzell,* for appellants.

*Kehoe & Kehoe,* for respondent.

ENGLERT, Dist. J. The plaintiff brought this action to enjoin the defendants from trespassing upon the East half of the Northwest quarter of Section 27, Township 157, Range 65, in Towner County, North Dakota, and to restrain them from moving or tearing down the barn located on said land. The plaintiff is the fee owner of the said

described premises, and for brevity and convenience the said premises will be hereinafter referred to as the east eighty.

The defendant, Bank of North Dakota, is the fee owner of the West half of the Northwest quarter of Section 27, Township 153, Range 65, Towner County, North Dakota, and for brevity and convenience, these premises will be hereinafter referred to as the west eighty.

The real dispute between the plaintiff and the defendant bank is over the dividing line between the said two eighties, and over a barn located on the east eighty, except that the southwest corner of said barn extends over onto the west eighty about three feet, and the northwest corner of said barn extends over onto the west eighty about seven feet.

The defendant, Virgil Lockhart, is not interested and makes no claim, and will not, therefore, be further mentioned.

The plaintiff, and the defendant bank both derived their ownership of the said premises through a common grantor, namely, James P. McGee.

James P. McGee homesteaded the west eighty, and one John C. Farrell homesteaded the east eighty.

It is the claim of the defendant bank that while James P. McGee lived on the west eighty, and John C. Farrell lived on the east eighty, they agreed on a dividing line between the said two eighties, some ninety or ninety-one feet east of the regular United States Government survey line. If this contention is established by the evidence, then the barn would belong to the defendant bank.

The case was tried to the court as one in equity, without a jury. The trial court found that the regular government survey line had not been changed, and that the plaintiff is .the owner of so much of the barn as rests upon his east eighty, and that the defendant bank is the owner of so much of the barn as rests upon its west eighty. The court determined the value of their respective interests in and to the barn, decreed the barn to the plaintiff, determined the damage done to the barn by the defendant bank, deducted its interest in the barn from the damage done and allowed judgment to the plaintiff for the difference. From the judgment thus entered, the defendant bank appealed. It asks for a trial de novo here.

1. The first point for consideration is: Did James P. McGee and

John C. Farrell agree upon a dividing line between the said two eighties at a point some ninety or ninety-one feet east of the regular government survey dividing line? There is no dispute and never was, so far as the record shows, over the true line established by the United States Government survey.

A determination of this point requires a further statement and consideration of the evidence bearing upon the rights of the respective parties.

As already stated, James P. McGee homesteaded the west eighty and one, John C. Farrell, homesteaded the east eighty.

On January 10th, 1901, Farrell made final proof, and received his final receiver's receipt for the east eighty. On November 14th, 1901, the said Farrell conveyed the said east eighty to James P. McGee, by warranty deed. From then on the said James P. McGee remained the fee owner of both the east and the west eighties, until he lost the same through mortgage foreclosure proceedings, as will be presently noted.

On November 28th, 1906, James P. McGee and Mary A. McGee, his wife, gave a mortgage upon the east eighty to D. F. McLaughlin. This mortgage was duly recorded. D. F. McLaughlin, on February 4th, 1907, assigned this mortgage to the Burlington Savings Bank. This bank foreclosed said mortgage, and received a sheriff's certificate of sale on June 12th, 1926. On January 25th, 1927, the said Burlington Savings Bank assigned its said sheriff's certificate to the plaintiff herein. On June 13th, 1928, the sheriff of Towner County issued a sheriff's deed of the said east eighty to the plaintiff herein.

Before the plaintiff became the owner of the said east eighty through the said sheriff's deed, James P. McGee was indebted to the plaintiff in the sum of $1958.79. To secure this indebtedness, James P. McGee and wife gave a second mortgage to the plaintiff on May 2nd, 1922, upon the east eighty. After describing the east eighty in the mortgage, there was typewritten therein the following statement: "Containing 80 acres of land, more or less, according to the United States Government Survey thereof,"—not according to any boundary established by private agreement, but by the government survey thereof, or that it contained less than 80 acres. This mortgage was duly recorded.

On September 26th, 1924, James P. McGee and Mary A. McGee, his

wife, made, executed and delivered to the Bank of North Dakota a mortgage upon the west eighty. This mortgage was duly recorded. On his making application for this mortgage, James P. McGee represented to the said bank that the buildings were located on the west eighty.

The bank foreclosed its said mortgage and, on July 5th, 1932, the sheriff of Towner County issued a sheriff's deed to the State Treasurer as trustee of the State of North Dakota.

The evidence so far as witnesses are concerned, upon which the defendant bank relies to show that McGee and Farrell agreed to establish the dividing line between the said east and west eighties, comes from Mrs. Isabel Jenkins, Mrs. Sevills Skinner, and Claude McGee. These are the children of James P. McGee.

Mrs. Jenkins is the oldest of the three McGee children mentioned. At the time that John C. Farrell deeded the east eighty to James P. McGee, in November, 1901, Mrs. Jenkins was either 13 or 14 years of age. Whatever agreement was made between McGee and Farrell to change the dividing line between the said two eighties, must have been made before McGee became the owner of both said eighties.

She testified that John C. Farrell bought a shack from her father and that they moved it to a point on the east eighty, plowed a furrow, and designated that as the line between the two eighties. She also testified: "Well, the line was just a little bit east of these poplar trees."

At the time the agreement is supposed to have been made, Claude McGee was either seven or eight years of age, and Mrs. Sevills Skinner was two or three years old.

Neither of these witnesses testified that there was any controversy between their father and John C. Farrell over the true government boundary line dividing these two eighties, or that there was any doubt concerning the same. There is no evidence in the record that there was ever any dispute between McGee and Farrell over the true government survey line. Their testimony is too indefinite, too general, too uncertain, to carry any conviction.

The defendant bank maintains that James P. McGee made certain admissions to Roy Young, and Ray Matthews, as to the line here claimed. Roy Young testified that, in company with two men, Huth

and Bierman, he went out to look at the east eighty, with the thought of buying the same. It was at this time, so he testified, in answer to leading and suggestive questions, that James P. McGee pointed out that the line was "from one to two hundred feet" east of the barn. From such a range in distance it would be exceedingly difficult to ascertain a dividing line. But Young was not at all certain as to whether McGee made any statement or admission as to the dividing line, or that he was present at the time the admission is claimed to have been made. When asked who accompanied him on that occasion and after mentioning Huth and Bierman, he said: "I think Claude McGee was there, but I couldn't swear to it."

"Mr. Butler: You mean James McGee?

"A. Yes."

When he said Claude he meant James. When he said, "I couldn't swear to it," that Claude was there, he meant that he couldn't swear that James McGee was there.

Ray Matthews testified that he asked James P. McGee where the dividing line between the said two eighties was. He wanted to fence eighty acres of pasture of his own land. McGee "told me it was by the box elder grove and the cottonwood or poplar. There was a poplar tree there that was about where the line was." "It (the tree) was five or six rods" east of the house. All this testimony is too uncertain to carry any persuasive influence.

James P. McGee was the fee owner of these two eighties, and in possession thereof from November, 1901, and until the plaintiff and defendant secured title. During all these years, there is nothing in the record to indicate that this supposed line was recognized, or in any way acted upon or acquiesced in by James P. McGee. There is an entire lack of proof as to that, except McGee's statement to the defendant bank that the buildings were on the west eighty. The value of this statement will be considered under the second point raised. An agreement, changing a boundary line, may be shown and established by direct evidence, and may be inferred from conduct and especially from long acquiescence. Stumpe v. Kopp, 201 Mo. 412, 99 S. W. 1075. But since the ownership of land is thereby affected, the proof establishing the new or agreed line should be clear and convincing.

Grants Pass Land & Water Co. v. Brown, 168 Cal. 456, 143 P. 754; McNamara v. Seaton, 82 Ill. 498.

We are of the opinion that the defendant bank has not shown by a preponderance of the evidence or at all that the government line dividing the two eighties was changed.

2. The defendant bank next contends that James P. McGee did not intend to have the mortgage, under which the plaintiff claims title to the east eighty, cover the barn. That mortgage was made and executed on November 28th, 1906. In his application for that mortgage, James P. McGee stated that there were no buildings on the east eighty and that the buildings were on the west eighty. The evidence, however, also shows that many years ago, there were some buildings on the west eighty, and that they were destroyed by fire. The foundations, to some extent are still there. But the barn here in controversy was not built until 1910 by James P. McGee. It rests on a stone foundation, and is permanently annexed to the land. The lean-to is a fixture of the same permanent nature, and was not built until 1917. The mortgage given on November 28th, 1906, conveys the land, "together with all the hereditaments and appurtenances thereunto belonging or in any wise appertaining." The sheriff's deed issued on foreclosure of this mortgage contains the same provision. It is a well established rule that buildings of a permanent nature, erected on and annexed to the land after the giving of a mortgage, go with the land, and inure to the benefit of the mortgagee. 27 Cyc. 1145; Woolridge v. Torgrimson, 59 N. D. 307, 229 N. W. 805; Gray v. Krieger, 66 N. D. 115, 262 N. W. 343.

It is, however, earnestly insisted by the defendant bank that, at the time James P. McGee made application to it for the mortgage, dated September 26th, 1924, he not only stated that the buildings were located on the west eighty, but that it establishes his recognition of the change in the boundary line, and that he intended to mortgage the barn to the defendant bank. There would be some force to this contention if the preponderance of the evidence were not to the contrary. The evidence shows that on November 29th, 1921, James P. McGee made application for fire insurance, and in that application he represented that the buildings were located on the east eighty. The evidence further shows that over a period of several years, and while

he was a member of the township equalization board, James P. McGee listed the buildings as being located on the east eighty. As a member of such board, he signed such assessments. The evidence also shows that when he, McGee, gave the mortgage, dated May 2nd, 1922, to the plaintiff, he represented to the plaintiff that the barn was located on the east eighty. On this evidence the contention of the bank cannot be sustained.

The testimony, both record and oral, in this case, does not change the law applicable to permanent structures resting partly on the land of the plaintiff and partly on the land of the defendant bank. Under this rule, the plaintiff is the owner of so much of the barn as rests on the east eighty, and the defendant bank is the owner of so much of the barn as rests on the west eighty. Beers v. St. John, 16 Conn. 322.

3. This brings us to the final point in controversy here. The trial court awarded the barn to the plaintiff, and allowed him $310.17 damages, done by defendant bank. This is assigned as error.

The defendant bank employed one Virgil Lockhart, the other defendant, to tear down the lean-to to this barn. The lumber from this lean-to was carried over and laid on the west eighty. He had also raised the main barn by means of jacks and blocks, and was about to move the same over onto the west eighty, when the plaintiff brought this action. The main barn is 48 feet long, 28 feet wide, and 16 feet high. It was built on a stone foundation. The lean-to was 48 feet long, 18 feet wide and 8 feet high. It rested on a stone foundation.

The main barn was built on the east eighty, except that the southwest corner thereof extends over onto the west eighty about three feet, and the northwest corner thereof extends over onto the west eighty about seven feet. So that the plaintiff is the owner of five-sixths of the barn, and the defendant bank is the owner of one-sixth of the main barn.

The lean-to to this barn was built on the east side of the main barn and was, therefore, all located on the east eighty.

The trial court found that the lean-to was, before it was torn down, of the value of $444.34. That the material salvaged and recovered of said lean-to was of the value of $134.17. That the net damage to the lean-to was $310.17. That the defendant bank damaged the

main barn, by tearing off the lean-to, in the sum of $50.00. That the plaintiff's total damage amounted to $360.17. That the value of the defendant bank's interest in the one-sixth part of said barn is $177.63. This amount was deducted from plaintiff's damage, leaving the net damage in favor of the plaintiff in the sum of $182.54.

As already stated, the trial court decreed the barn to the plaintiff, ordered its removal from the west eighty, and allowed the plaintiff $182.54, damages against the defendant bank.

No question is raised with reference to the method of disposition of the barn prescribed by the trial court in event the bank is found not to be the owner thereof. The contentions of the bank are that it is the owner of the barn, and that if it is found not to be the owner, the damages are excessive.

After a careful review and consideration of the facts in this case, we are inclined to agree with the conclusions reached by the trial court. It follows that the judgment appealed from should be affirmed. It will be so ordered.

CHRISTIANSON, Ch. J., and BURR, NUESSLE and MORRIS, JJ., concur.